UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FUAD ALJABARI, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-6645 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| ALEJANDRO MAYORKAS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **MEMORANDUM OPINION AND ORDER**

Fuad Aljabari is a nonimmigrant living in the United States with a U visa, which is set aside for crime victims who help the government. He applied to adjust his status to become a permanent resident, but the U.S. Citizenship and Immigration Services has taken over a year to get back to him. Aljabari wants the agency to speed things up, so he sued Secretary of Homeland Security Alejandro Mayorkas, USCIS Officer Thomas Cioppa, FBI Director Christopher A. Wray, and former Secretary of State Mike Pompeo.

Defendants moved to dismiss. For the following reasons, the motion is granted.

### **Background**

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Aljabari is a Jordanian citizen. *See* Cplt., at ¶ 5 (Dckt. No. 1). On October 1, 1995, he first entered the United States on a B1/B2 visa. *Id.* at ¶ 8. That's a nonimmigrant visa for people

entering the United States temporarily for business and tourism purposes.[1] Aljabari apparently left the country at some point after entering in 1995, but the complaint doesn't say when.

In 2012, Aljabari decided that he wanted to return to the United States. So, on December 27, 2012, he filed a form called an I-192 Application for Advance Permission to Enter as a Nonimmigrant. *Id.* at ¶ 9.

Aljabari doesn't reveal what happened to that form. But he does allege that the U.S. approved a few other applications on his behalf, called an I-918 and an I-131. *Id.* at ¶¶ 10–11. In October 2017, the U.S. Citizenship and Immigration Services ("USCIS") approved his I-918 Application for U Nonimmigrant Status. *Id.* at ¶ 10. Aljabari received a U visa, which is reserved for victims of certain crimes involving violence, sexual assault, and trafficking. *See* Victims of Criminal Activity: U Nonimmigrant Status, USCIS, https://www.uscis.gov/humanitarian/victims-of-human-trafficking-and-other-crimes/victims-of-criminal-activity-u-nonimmigrant-status (last accessed June 9, 2022). In April 2018, USCIS approved his I-131 Application for Travel Document, which allowed him to travel abroad and reenter the United States. *See* Cplt., at ¶ 5 (Dckt. No. 1); I-131, Application for Travel Document, USCIS, https://www.uscis.gov/i-131 (last accessed June 9, 2022).

Later, Aljabari wanted to adjust his status from nonimmigrant to permanent resident. So, using a form called an I-485 Application to Register Permanent Residence or Adjust Status (often called a "green card application"), he applied for permanent residence. *See* Cplt., at ¶ 12 (Dckt. No. 1). On October 13, 2020, USCIS informed him that it had received his green card application. *Id.*

---

[1] For more information on B1, B2, and B1/B2 visas, see Visitor Visa, U.S. Dep't of State – Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/us-visas/tourism-visit/visitor.html (last visited June 9, 2022).

Since then, more than a year has passed. *Id.* at ¶ 13. Aljabari is still waiting for a decision on his application. *Id.* And, as a result, he alleges that the agency has deprived him of his right to obtain necessary paperwork to stay in the United States with his wife and two children. *Id.* at ¶ 14.

Aljabari got tired of waiting, and eventually sued Secretary of Homeland Security Alejandro Mayorkas, FBI Director Christopher Wray, USCIS officer Thomas Cioppa, and former Secretary of State Mike Pompeo in December 2021. *Id.* at ¶¶ 6–7. He alleges that they violated the Administrative Procedure Act by unlawfully withholding or unreasonably delaying a decision on his green card application. *Id.* at ¶ 16. He seeks a writ of mandamus. *Id.* at ¶¶ 1, 16.

Defendants, in turn, moved to dismiss. *See* Defs.' Mtn. to Dismiss (Dckt. No. 6). The basic issue is whether Plaintiff alleged a claim of unreasonable delay.

**Legal Standard**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

3

**Analysis**

Aljabari asks this Court to compel Defendants to rule on his green card application and complete a background and fingerprint check. *See* Cplt., at ¶ 17 (Dckt. No. 1). Defendants respond that (1) Aljabari sued some of the wrong people, and (2) they have not acted unreasonably. *See* Defs.' Mem., at 3–13 (Dckt. No. 7). This Court will skip over the first argument and jump to the second. The complaint fails to allege a claim of unreasonable delay by the agency.

The APA allows district courts to "compel agency action unlawfully withheld or unreasonably delayed." *See* 5 U.S.C. § 706(1). A district court's "consideration of any mandamus petition 'starts from the premise that issuance of the writ is an extraordinary remedy, reserved only for the most transparent violations of a clear duty to act.'" *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (citation omitted).

"In the case of agency inaction, [courts] not only must satisfy [themselves] that there indeed exists such a duty, but that the agency has 'unreasonably delayed' the contemplated action." *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000). "The central question in evaluating 'a claim of unreasonable delay' is 'whether the agency's delay is so egregious as to warrant mandamus.'" *In re Core Comms'ns, Inc.*, 531 F.3d at 855 (quoting *Telecomms. Rsch. & Action Ctr. v FCC* ("*TRAC*"), 750 F.2d 70, 79 (D.C. Cir. 1984)).

A writ of mandamus is an exercise of force, so courts must tread lightly. The need for caution is especially great where, as here, the underlying action is entrusted to a co-equal branch of government, and the legislative branch has vested the executive branch with discretion. Courts must stay in their lane, and forcibly intervene only when it is clear that the agency has gone off the rails.

The *TRAC* court established a six-factor framework for evaluating whether an agency has unreasonably delayed taking action. Specifically:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 80 (cleaned up); *see also In re Core Commc'ns, Inc.*, 531 F.3d at 855; *Menominee Indian Tribe of Wis. v. EPA*, 947 F.3d 1065, 1075 (7th Cir. 2020) (Hamilton, J., concurring) (citing *TRAC* for the "general framework for deciding claims of agency delay that courts can apply to unanswered rulemaking petitions"). The *TRAC* framework applies to immigration decisions. *See, e.g.*, *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003).

This Court considers each of the six factors and concludes that most of the factors weigh in favor of Defendants. Simply put, the allegations of the complaint cannot support a claim of unreasonable delay.

**I.    Factor One: Rule of Reason**

The first *TRAC* factor – whether the decision is governed by a rule of reason – is the "most important." *In re Core Commc'ns, Inc.*, 531 F.3d at 855. "It requires an inquiry into whether there is 'any rhyme or reason' for the Government's delay – in other words, 'whether the agency's response time . . . is governed by an identifiable rationale.'" *Palakuru v. Renaud*,

5

521 F. Supp. 3d 46, 50–51 (D.D.C. 2021) (quoting *Ctr. for Sci. in the Pub. Interest v. FDA*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014)). This factor heavily favors Defendants.

USCIS decides applications for adjustment of status for U nonimmigrants on a first-in, first-out basis. *See* Adjustment of Status to Lawful Permanent Resident for Aliens in T or U Nonimmigrant Status, 73 Fed. Reg. 75540, 75555 (Dec. 12, 2008) ("In the U nonimmigrant rule, USCIS decided to adjudicate petitions on a first in, first out basis with additional procedures for petitions received after the numerical cap has been reached."). It is not unlike pulling a ticket at a deli, and waiting to have your number called. It reflects an all-American principle: first come, first served.

Courts widely recognize that a first-in, first-out method counts as a rule of reason. *See, e.g.*, *Palakuru*, 521 F. Supp. 3d at 51; *N-N v. Mayorkas*, 540 F. Supp. 3d 240, 261 (E.D.N.Y. 2021); *Muvvala v. Wolf*, 2020 WL 5748104, at *3 (D.D.C. 2020); *A.C.C.S. v. Nielsen*, 2019 WL 7841860, at *4 (C.D. Cal. 2019); *but see Gonzalez v. Cuccinelli*, 985 F3d 357, 375 (4th Cir. 2021) ("While a 'first in, first out' approach with enumerated exceptions may be a rule of reason, we do not know enough about how the agency implements its rules and exceptions."). First-in, first-out is a rule of reason. There is fairness in requiring everyone to wait their turn.

Aljabari has not alleged that the USCIS departed from its first-in, first-out system here. *Cf. Barrios Garcia v. U.S. Dep't of Homeland Sec.*, 25 F.4th 430, 435 (6th Cir. 2022). That is, he isn't alleging that someone else budged in front of him, or that the USCIS is making him wait while it handles applications of people who applied later. He merely alleged that he applied for adjustment of status, and that a year has passed without adjudication. *See* Cplt., at ¶ 13 (Dckt. No. 1).

6

The passage of time is not the only variable when assessing the government's delay in ruling on an application. The speed of government action depends on the amount of time and the number of tasks on the agency's plate. It's easy to say that a year is a long time to wait. And, for any particular applicant, it undoubtedly feels that way. No one likes to wait.

But no applicant stands in a line of one, especially when seeking something as coveted as permanent residence in the United States. Lots of people want that, too. And they're in line, too. Thousands of them.

USCIS has to be careful when evaluating the people in line. Granting permanent residence to someone is serious business, and a careful review takes time. The careful review means that waiting is part of the game. Applying for permanent residence is not like going to an ATM, where a person can submit a request and receive immediate gratification.

The numbers help to explain why things take time. For October through December 2021 (the quarter when Aljabari applied for his adjustment of status), USCIS received 20,012 humanitarian-based adjustment-of-status requests. *See* Immigration and Citizenship Data, USCIS, https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data (last accessed June 9, 2022). And, presumably, USCIS had earlier applications, meaning applications filed before October 2021, on its plate, too.

Wading through that ocean of applications would undoubtedly take significant time, even for an agency of the U.S. government. The volume of applications means that some amount of delay is inevitable. USCIS has a procedure for how to handle the applications, and the complaint does not allege that the agency has departed from that first-in, first-out procedure. Without any alleged irregularities, USCIS is managing a mountain of applications in a manner that follows a rule of reason.

7

## II. Factor Two: Guidance from Congress

The second *TRAC* factor involves looking at the statutory scheme and deciding whether Congress provided guidance on how much time the procedure should take. Once again, this factor favors Defendants.

Congress did not specify how long agencies should take to review an application for adjustment of status. Instead, Congress gave agencies "wide discretion in the area of immigration processing." *See Skalka v. Kelly*, 246 F. Supp. 3d 147, 153–54 (D.D.C. 2017). "Absent a congressionally supplied yardstick, courts typically turn to case law as a guide." *Sarlak v. Pompeo*, 2020 WL 3082018, at *6 (D.D.C. 2020). And while courts have not drawn a bright-line rule, they often consider delays between three and five years to be reasonable. *Id.* (collecting cases); *see also id.* ("[N]o court has found a basis for deeming a delay of two years in processing a waiver unreasonable.").

Again, without any in-circuit precedent to guide it, this Court will side with the other district courts on this issue. Aljabari began waiting in October 2020, and then filed suit in December 2021. *See* Cplt., at ¶ 13 (Dckt. No. 1). All other courts recognize that a one-year delay (if not more) is reasonable, and this Court sees no reason to break from the pack.

## III. Factors Three and Five: Human Interests and Personal Harm

"The third and fifth factors overlap – the impact on human health and welfare and economic harm, and the nature and extent of the interests prejudiced by the delay." *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 118 (D.D.C. 2005); *see also Whitlock v. U.S. Dep't of Homeland Sec.*, 2022 WL 424983, at *7 (D.D.C. 2022) (noting that factors three and five are "often considered in tandem") (collecting cases).

8

Aljabari remains in the United States on a U visa, meaning that he is a victim of some sort of crime. *See* Cplt., at ¶ 10 (Dckt. No. 1). He alleges that his wait time has "deprived [him] of his right to obtain necessary paperwork to stay in the United States with his wife and two children." *Id.* at ¶ 14. This Court acknowledges the very human dimension of the application.

But for now, Aljabari is lawfully in the country with a U visa. And he doesn't face any risk of removal from the United States. His U-status is in place for the entire pendency of his adjustment of status (unless he does something that can get him kicked out, like committing a crime). *See* 8 U.S.C. §§ 1184(p)(6), 1229a(e)(2), 1227(a). In fact, the complaint alleges that Aljabari is currently "in the United States with his wife and two children." *See* Cplt., at ¶ 14 (Dckt. No. 1). He resides in America with his family, and he is not under any immediate threat of removal. He's here, and he isn't going anywhere.

Aljabari understandably wants an adjudication of his application. He faced serious crime abroad, came to the United States as a result, and now wants to stay forever. But in the meantime, any actual risk to his health or safety is low. He is in the United States and can remain here with his family while the application is pending.

## IV. Factor Four: Prioritization

The fourth factor "considers the effect of prioritizing one agency action over others." *Whitlock*, 2022 WL 424983, at *7. It directs the Court to consider whether expediting the decision in this case will impact other agency decisions of equal or higher priority. *See TRAC*, 750 F.2d at 80. That factor weighs against Aljabari. He has no right to jump the line, and cut in front of people who have been waiting longer than him.

The Seventh Circuit has ruled that an applicant does not have a "right to skip ahead of other petitioners who filed an application before [him], but who are also waiting for an

9

adjudication" of their visa. *See Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017). In *Calderon-Ramirez*, the petitioner "fail[ed] to set forth any facts that differentiate himself from other petitioners waiting ahead of him for adjudication." *Id.* "With nothing in the record to suggest his wait time has been any more unreasonable than other petitioners waiting in the same line," the Court of Appeals declined to provide relief. *Id.* at 276.

The Seventh Circuit is not alone. The D.C. Circuit has "refused to grant relief" in a case where all the *TRAC* factors except the fourth factor favored a petitioner. *See Mashpee Wampanoag Tribal Council*, 336 F.3d at 1100 (citing *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 75 (1991)). The D.C. Circuit did not believe it appropriate to move one person "at the head of the queue" if the result would "simply move[] all others back one space and produce[] no net gain." *See Barr Lab'ys*, 930 F.2d at 85.

Other district courts have rejected similar attempts to skip the line. *See, e.g.*, *Fangfang Xu v. Cissna*, 434 F. Supp. 3d 43, 55 (S.D.N.Y. 2020) ("The effect of leapfrogging Plaintiff's application to the front of the line would do nothing to cure the deficiencies of the asylum application process; it would only harm other applicants, who are equally deserving of prompt adjudication."); *Gong v. Duke*, 282 F. Supp. 3d 566, 569 (E.D.N.Y. 2017) ("There are many other applicants who have waited even longer than plaintiff; to grant him priority is to push them further back in line when the only difference between them is that plaintiff has brought a federal lawsuit. That factor should not give him any advantage.").

Aljabari has not come forward with a reason for jumping in front of other applicants in line. Everyone in line wants the same thing – a ruling. But there is no particular reason for giving preferential treatment to Aljabari compared to people who applied before him. There is no reason to compel an express lane.

Giving Aljabari special treatment would not be cost-free. The line is zero sum – any time spent on Aljabari's application can't be spent on other applications. So making Aljabari wait *less* would mean that someone else has to wait *more*. In the meantime, a judicial reshuffling of the deck would embroil courts in the process of deciding who should receive attention when, a decision vested in the executive branch.

USCIS treats everyone in line the same, and Aljabari has not come forward with a reason why he should receive special treatment.

## V.     Factor Six:  Impropriety

The sixth factor is about impropriety. The idea is that a court can find unreasonable delay, even if the agency isn't engaging in impropriety. *See TRAC*, 750 F.2d at 80. Unreasonable delay does not require bad acts. And here, Aljabari does not allege impropriety. He merely alleges that he is waiting too long, and that USCIS is taking too long. *See* Cplt., at ¶ 16 (Dckt. No. 1).

Unreasonable delay, in and of itself, is not bad faith. As already noted, delay is entirely consistent with a first-in, first-out system for handling tens of thousands of applications a year. Courts are "split on how to consider the sixth factor when, as here, the petitioner does not allege impropriety." *Whitlock*, 2022 WL 424983, at *8. Some courts conclude that the factor is not relevant, and others find that the lack of any alleged impropriety weighs in favor of the defendants. *Id.* (collecting cases).

This Court does not need to take a side on the issue "because treating it as neutral will not change the result." *Id.* For present purposes, it is enough to say that Aljabari has not pointed to any impropriety, so this factor does not tip in his favor.

*     *     *

Ordinarily, when granting a motion to dismiss, this Court would give leave to amend. But here, this Court assumes that giving that opportunity would be futile. The Court assumes that Aljabari has already pled the facts that, in his view, support his claim.

As a result, the Court is dismissing the complaint and closing the case. If Aljabari believes that he has additional facts that would support a claim, then he can file a motion for leave to amend. But in the meantime, the case is closed.

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted.

Date: June 9, 2022

Steven C. Seeger
United States District Judge